UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| ROSEMARY GREENLAW,<br><br>Plaintiff,<br><br>v.<br><br>JULIE SU,<br><br>Defendant. | Case No.  18-cv-04932-VKD<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. Nos. 119, 120, 121 |

Plaintiff Rosemary Greenlaw filed this action against the Secretary of Labor ("Secretary"), alleging, among other things, discrimination on the basis of age and disability and retaliation for engaging in protected conduct. *See* Dkt. Nos. 1, 8.  The Secretary now moves for summary judgment.  Dkt. Nos. 120, 128.  Ms. Greenlaw opposes the motion.  Dkt. No. 127.  Upon consideration of the moving and responding papers, as well as the oral arguments presented, the Court grants the Secretary's motion for summary judgment in part and denies the motion in part.

## I.    BACKGROUND

### A.    Factual Background

Unless otherwise indicated, the following facts are undisputed.

#### 1.    Request for Reasonable Accommodation

After retiring from prior federal service, Ms. Greenlaw sought to re-enter civil service.  On April 4, 2016, she began working in the U.S. Department of Labor ("DOL") as an Administrative Assistant for the Occupational Safety and Health Administration ("OSHA") in OSHA's Region 9 office in San Francisco.  *See* Dkt. No. 8, ¶¶ 12, 13; Dkt. No. 120-4, Ex. A (Greenlaw Dep. at

United States District Court
Northern District of California

59:10-24; 77:8-14). According to Loren Delicana, Ms. Greenlaw's supervisor,[1] Ms. Greenlaw's primary role as Administrative Assistant was to "assist the Regional Administrator's office," though her duties also included "support[ing] the other units in the office." Dkt. No. 120-4, Ex. B (Delicana Dep. at 17:18-21).

Ms. Greenlaw says that she is older than 40 and has a disability. *See* Dkt. No. 8 ¶¶ 2, 14, 18, 36. Although that disability is not identified in her operative first amended complaint (*see generally* Dkt. No. 8), in this litigation Ms. Greenlaw identified her disability as cancer. *See* Dkt. No. 120-4, Ex. A (Greenlaw Dep. at 94:10-21; 181:22-182:2). Ms. Greenlaw did not tell anyone at DOL that she had cancer. *See id.* (Greenlaw Dep. at 182:3-16).

On April 5, 2016, Ms. Greenlaw began bringing her dog Tippi, a Bedlington Terrier, to work. *See id.* (Greenlaw Dep. at 97:13-16); *see also* Dkt. No. 127-2 at ECF 13, 37. On April 11, 2016, Ms. Greenlaw completed a reasonable accommodation request form, asking for permission to bring Tippi to work. *See* Dkt. No. 127-2 at ECF 8-10; *see also* Dkt. No. 120-4, Ex. A (Greenlaw Dep. at 100:25-101:22). In the request form, Ms. Greenlaw identified Tippi as her "therapy dog" and stated that the reason for her request was "[t]o assist with comfort and productivity in the work place." Dkt. No. 127-2 at ECF 8. Ms. Greenlaw's request included a letter from her doctor, stating that Ms. Greenlaw "has a chronic medical condition that causes pain and anxiety" and that she "has a therapy service animal who helps in times of stressors[.]" *Id.* at ECF 9. The letter requests that Ms. Greenlaw "be allowed to bring her pet with her as allowed by policy." *Id.* Aside from a reference to her doctor's note, in deposition Ms. Greenlaw testified that Tippi is not certified by any organization as a service animal. *See* Dkt. No. 120-4, Ex. A (Greenlaw Dep. at 93:21-94:9).

Ms. Greenlaw says that around April 14, 2016, she was verbally informed that her request to bring Tippi to work was granted, followed by a formal memo dated May 16, 2016, confirming

---

[1] At the time Ms. Greenlaw was hired, Ms. Delicana (Team Leader for Administrative Programs) was serving as the acting Assistant Regional Administrator while Ms. Delicana's supervisor, James Dement, was on a temporary assignment. Josh Paul (the then acting Team Leader for Administrative Programs) initially served as Ms. Greenlaw's supervisor until around June 2016 when Ms. Delicana resumed her duties as Team Leader for Administrative Programs. *See* Dkt. No. 120-4, Ex. B (Delicana Dep. at 13:17-20, 18:8-15).

the approval of her requested accommodation. *See* Dkt. No. 8 ¶ 36; Dkt. No. 127-2 at ECF 11; *see also* Dkt. No. 120-4, Ex. A (Greenlaw Dep. at 106:14-25).

Unbeknownst to Ms. Greenlaw, Ms. Delicana, began keeping written notes about Tippi from the day Ms. Greenlaw began her employment with OSHA. *See* Dkt. No. 127-2 at ECF 13-17. The notes include an April 6, 2016 entry regarding staff concerns about "the dog smell"; a report that "Tippi made a mess on the first day and [Ms. Greenlaw] did not clean it up"; and instances when Tippi barked, "jumped up," or was seen without a leash. *See id*. Ms. Greenlaw points out that Ms. Delicana's notes also indicate that on April 11, 2016, "Tippi had a bath and is clean." *Id*. at ECF 13. Additionally, in deposition, Ms. Delicana stated that she did not know if Ms. Greenlaw knew of the mess Tippi made, and acknowledged that Ms. Greenlaw would clean-up after Tippi on other occasions. *See* Dkt. No. Dkt. No. 127-4 (Delicana Dep. at 90:7-20).

Ms. Delicana's notes reflect that in Ms. Greenlaw's July 14, 2016 mid-year review, Ms. Delicana discussed Tippi with her, including whether there were any updates regarding Ms. Greenlaw's accommodation and whether Ms. Delicana could provide any other assistance; building facility requirements that Tippi must be under Ms. Greenlaw's control at all times and that Ms. Greenlaw was responsible for cleaning up after Tippi; and confirmation by Ms. Delicana that there were no recent reports from staff about Tippi. Dkt. No. 127-2 at ECF 14; *see also id*. at ECF 22. There is no indication that Ms. Greenlaw's mid-year review addressed any topics other than Tippi.

Ms. Delicana's notes also document a July 22, 2016 incident when a visitor to the OSHA office was startled by Tippi. *See* Dkt. No. 127-2 at ECF 15. The visitor was in the office talking with Ms. Greenlaw for about five minutes before she noticed Tippi, screamed, and then fell, at which point Tippi barked. When asked what happened, the visitor stated that she was not hurt, and was surprised to see a dog in the office because she was from an Asian country where that was uncommon, but said that Tippi was cute. *See id.*

On August 4, 2016, Ms. Delicana sent an email to Dr. Janet Callwood, a point of contact who worked in the DOL Reasonable Accommodation Office. *See* Dkt. No. 127-2 at ECF 22-23; Dkt. No. 120-4, Ex. I (Dement Dep. at 200:14-16). Ms. Delicana relayed to Dr. Callwood the July

United States District Court
Northern District of California

22, 2016 incident involving Tippi and the office visitor and stated, "When we last spoke, you indicated that you would speak to [Ms.] Greenlaw about a service versus comfort dog as it relates to [the] ADA.  Also, with this most recent incident, I would appreciate your guidance on the next steps for handling [Ms.] Greenlaw's reasonable accommodation."  Dkt. No. 127-2 at ECF 22-23.  Ms. Delicana testified that she sought guidance from Dr. Callwood "to make sure that [Ms. Delicana] aligned with whatever was agreed upon between Dr. Callwood, Ms. Greenlaw, and the accommodation," and that "the accommodation . . . was working for Ms. Greenlaw" and also for the office.  *See* Dkt. No. 120-4, Ex. B (Delicana Dep. at 151:14-25); Dkt. No. 127-4 (Delicana Dep. at 126:14-127:18).

In a subsequent email sent to Dr. Callwood on August 23, 2016, Ms. Delicana noted that her supervisor, James Dement (Assistant Regional Administrator of OSHA Region 9), received information from the building's management regarding "complaints about Tippi's barking and/or jumping on people."  Dkt. No. 127-2 at ECF 21.  Ms. Delicana further noted, "We let them know we are working with you on this."  *Id*.  When Dr. Callwood responded that she would "contact [Ms. Greenlaw] concerning the possible need to remove the animal from the workplace," Mr. Dement replied, "Your message appears to indicate that management is prepared to remove the animal from the workplace—this is not correct.  At this time, we <u>are not</u> asking for the animal to be removed."  *Id*. at ECF 19.  Mr. Dement also separately reached out to another contact, Christina Peterson, regarding the distinction between a service animal and an emotional/support animal.  *See* Dkt. No. 120-4, Ex. V.  Mr. Dement testified that the inquiries to Dr. Callwood and Ms. Peterson were made so that they could educate themselves and make sure that they were providing the right level of support and meeting their obligations.  *See* Dkt. No. 120-4, Ex. I (Dement Depo. at 196:11-198:19, 199:4-11, 200:11-20).  There is no indication that DOL ever told Ms. Greenlaw that she was not allowed to bring Tippi to work, or that DOL modified or changed her requested accommodation.  *See* Dkt. No. 120-4, Ex. A (Greenlaw Dep. at 107:1-9, 108:1-4).

### 2.    Whistleblower Investigator Position

Meanwhile, around June 2016, Ms. Greenlaw applied for a position as a Whistleblower Investigator in the same OSHA office where she worked as an Administrative Assistant.  *See* Dkt.

4

No. 8 ¶ 14 & Ex. B at 1.  Although she was interviewed, Ms. Greenlaw was not selected for the investigator position.  *See* Dkt. No. 119-1 ¶¶ 8, 10.  Records submitted by the Secretary indicate that, of the 11 applicants were who interviewed and evaluated for the Whistleblower Investigator position,[2] Ms. Greenlaw received the lowest overall score.  *See* Dkt. No. 119-2 ¶ 11, Ex. L.

### 3.    Staff Assistant Position

After her unsuccessful application to be a Whistleblower Investigator, Ms. Greenlaw says she was asked to perform the duties of a different position, Staff Assistant, but was not given the higher pay grade and compensation associated with that position.  *See* Dkt. No. 8 ¶ 15.  Ms. Greenlaw requested a desk audit, i.e., an evaluation of her work in accordance with various pay grades.  The desk audit would have been conducted by OASAM (Office of the Assistant Secretary for Administration and Management), the human resources division within DOL.  Ms. Delicana testified that she referred Ms. Greenlaw's request for a desk audit to OASAM.  *See* Dkt. No. 120-4, Ex. B (Delicana Dep. at 145:15-146:20).  Ms. Greenlaw did not receive an audit.  Ms. Greenlaw also requested a promotion to the Staff Assistant position (after the individual who held that position was hired as a Whistleblower Investigator).  Her request was denied.  *See* Dkt. No. 8 ¶ 15; Dkt. No. 119-2 ¶¶ 13-14.  According to DOL, the Staff Assistant position was not filled by anyone due to a hiring freeze.  *See* Dkt. No. 120-4, Ex. B (Delicana Dep. at 145:1-10); *see also* Dkt. No. 119-2 ¶ 15.

### 4.    Alleged Performance and Conduct Issues

The Secretary maintains that Ms. Greenlaw performed her Administrative Assistant job poorly and that there were also issues with her conduct.  The alleged performance issues concerned (1) Ms. Greenlaw's failure to start meetings on time, (2) Ms. Greenlaw's failure to

---

[2] The Court finds compelling reasons to grant the Secretary's motion to seal portions of the declarations of Mark Marchione and Kathleen McCormick that reveal the names, scores, and background information of the other applicants, as that information implicates those individuals' personal privacy interests.  Dkt. No. 119; *Kamakana v. City & Cnty. of Honolulu*, 447 F.3d 1172, 1178-79 (9th Cir. 2006) ("Those who seek to maintain the secrecy of documents attached to dispositive motions must meet the high threshold of showing that 'compelling reasons' support secrecy.").  In any event, none of that information bears on the resolution of the present motion for summary judgment.  This order otherwise publicly discloses information from the declarations of Mr. Marchione and Ms. McCormick that the Court concludes does not meet the applicable standard for sealing.

United States District Court
Northern District of California

1    properly keep meeting minutes, and (3) issues with Ms. Greenlaw's prioritization of tasks and

2    failure to update a department "tracker" or "log" of tasks.  The alleged conduct issues concerned

3    Ms. Greenlaw using her personal phone to record meetings, and an August 2, 2016 incident

4    involving the building's security personnel.

5                                    a.        Weekly meetings

6                As part of her duties as Administrative Assistant, Ms. Greenlaw was tasked with setting up

7    weekly executive Webex meetings and conferences.  *See* Dkt. No. 120-4, Ex. (Greenlaw Dep. at

8    141:23-142:15); *Id*., Ex. B (Delicana Dep. at 26:24-27:9).  Ms. Greenlaw agreed that she was

9    "informally trained" on how to set up those meetings and conferences, stating that she "was shown

10   how the system worked . . . and from time to time fixes when it didn't work."  Dkt. No. 120-4, Ex.

11   A (Greenlaw Dep. at 142:2-7, 12-15).  Ms. Delicana testified that although she and Ms. Greenlaw

12   would "practice and rehearse several times so that Ms. Greenlaw [could] get used to it," Ms.

13   Greenlaw "struggled" to set up the meetings, which led to delays in the 9:00 a.m. meeting start

14   time.  Ms. Delicana testified that the delays were "really embarrassing" because "[t]he Regional

15   Administrator was there," and "[Ms. Delicana] had to explain the delays."  *See* Dkt. No. 120-4,

16   Ex. B (Delicana Dep. at 26:25-27:14, 27:24-28:14).  According to Ms. Delicana, although she met

17   informally with Ms. Greenlaw, "maybe two or three times a week," to discuss "[Ms. Greenlaw's]

18   concerns . . ., if she needed assistance, how [Ms. Delicana] could help her" in order for Ms.

19   Greenlaw to "do this task without any assistance," "it got to the point where [Ms. Delicana] had to

20   be there right with her" and "help [Ms. Greenlaw] out during meetings."  *Id*. (Delicana Dep. at

21   28:9-10, 15-16, 29:13-20).  Additionally, Ms. Delicana says that "[t]here were times where,

22   despite discussion of the importance of these meetings, sometimes [Ms. Greenlaw] was late."  *See*

23   *id*. (Delicana Dep. at 28:16-18).  Although she could not identify the number of times Ms.

24   Greenlaw was not able to set up the weekly meetings and conferences, Ms. Delicana testified that

25   she "worked with [Ms. Greenlaw] one on one, around late June.  We were still having the issues in

26   September."  *See id*. (Delicana Dep. at 28:21-29:9).

27                Kimberly Nelson (then Acting Deputy Regional Administrator) also testified that, based on

28   her personal observations, Ms. Greenlaw was not able to "[p]ut the meeting up on the screen and

United States District Court
Northern District of California

6

have the video going and the microphone so that you could communicate, you know, virtually," and that there were "several occasions" when Ms. Nelson "watched [Regional Administrator] Barbara [Goto] basically just do it because [Ms. Greenlaw] couldn't get it done."  Dkt. No. 120-4, Ex. J (Nelson Dep. at 61:77-62:12, 70:21-71:12).  Ms. Nelson also testified there was one occasion when Ms. Greenlaw did not show up to start the meeting at all.  *Id*. (Nelson Dep. at 62:10-12, 72:10-18).

Mr. Dement testified that for "the vast majority of the time" she was employed by OSHA, Ms. Greenlaw did not start the executive meetings on time, which reflected poorly on the Regional Administrator.  Dkt. No. 120-4, Ex. I (Dement Dep. at 44:24-46:18).  Although Mr. Dement could not quantify how often the meetings started late, he stated that it happened "frequently enough that it was an irritation to the management that participated in those meetings" and that when Ms. Greenlaw was responsible for setting up the meetings, "it was not a surprise that she would not do it on time, and it required a lot of active effort to try to remind her to be on time."  *See id*. (Dement Dep. at 48:17-24, 251:22-25).

With respect to the weekly executive meetings and conferences, Ms. Greenlaw testified that it was "[n]ot a problem with [her] setting it up"; rather, "[t]he system often didn't work."  Dkt. No. 120-4, Ex. A (Greenlaw Dep. at 142:21-23).  Additionally, she maintains that the Secretary's sole documentation of a failure to timely start a meeting shows that Ms. Delicana sent her emails at 9:30 p.m. on the Sunday before the Monday morning meeting, knowing that Ms. Greenlaw would not be online at that time, and without providing Ms. Greenlaw with the meeting link.  Ms. Greenlaw says that she did not receive the meeting login information until 8:50 a.m. the next day when Mr. Dement sent it to her.  *See* Dkt. No. 127-2 at ECF 27-28; Dkt. No. 127-4 (Delicana Dep. at 193:17-19).  In other words, Ms. Greenlaw contends that the one documented failure to start a meeting on time was entirely attributable to Ms. Delicana.

### b.    Meeting minutes

In deposition, Ms. Greenlaw agreed that one of her responsibilities as an Administrative Assistant was to record the minutes for the executive meetings and conferences.  *See* Dkt. No. 120-4, Ex. A (Greenlaw Dep. at 139:2-5).  Ms. Delicana testified that she "spent numerous times

United States District Court
Northern District of California

United States District Court
Northern District of California

1    with [Ms. Greenlaw] to train her, make sure she understood the importance of it, taking the

2    minutes. . . . we spent basically a lot of time together to try to get her to do this task well,"

3    including work on "the format" and "the expectation of the minutes," which "had to be released

4    within a day or two of the meeting."  Dkt. No. 120-4, Ex. B (Delicana Dep. at 27:10-14, 31:7-9).

5    According to Ms. Delicana, "this progressed over several months."  *Id.* (Delicana Dep. at 31:10).

6    Ms. Delicana testified that Ms. Greenlaw missed action items and points of discussion, which "are

7    important to the Regional Administrator's office to share with the leadership team."  *Id.* (Delicana

8    Dep. at 31:14-19).  As a result, Ms. Delicana testified that she spent time reviewing and editing

9    Ms. Greenlaw's minutes.  *Id.* (Delicana Dep. at 31:24-32:2).

10          Mr. Dement testified that his expectation was that the minutes "were posted and accurate,"

11    meaning that the minutes should be "accurate, complete" and "available for others to view."  Dkt.

12    No. 120-4, Ex. I (Dement Dep. at 128:14-15, 22-23).  He ordinarily was not involved in the

13    preparation of the minutes, as that "would be a discussion that [Ms. Delicana] and [Ms. Greenlaw]

14    would have one-on-one."  *Id.* (Dement Dep. at 128:11-13).  His understanding of Ms. Greenlaw's

15    performance regarding meeting minutes is based on reports from Ms. Delicana.  *Id.* (Dement Dep.

16    at 128:15-17, 129:12-15).  Mr. Dement testified that "[o]n at least one occasion," he observed that

17    Ms. Delicana posted the meeting minutes.  When he asked Ms. Delicana why she did that, Ms.

18    Delicana "commented that she had to correct the notes after [Ms. Greenlaw] worked on them."  *Id.*

19    (Dement Dep. at 129:4-8).

20          According to Ms. Greenlaw, she was not trained on how to record the meeting minutes.

21    *See* Dkt. No. 120-4, Ex. A (Greenlaw Dep. at 139:6-12).  Nor does she recall that anyone ever told

22    her that they were not satisfied with the way she prepared the minutes and that she should prepare

23    the minutes in a different way.  *Id.* (Greenlaw Dep. at 139:20-24).  She testified that there were

24    "not discussions per se" regarding issues with her recording of the minutes; rather, she says that

25    "[a]fter [she] created the minutes, they were circulated for any additions, corrections."  *Id.*

26    (Greenlaw Dep. at 139:13-18).  She denies that anyone prepared the minutes for her.  *Id.*

27    (Greenlaw Dep. at 141:8).  Additionally, she points out that the Secretary has presented no

28    documentation corroborating Ms. Delicana's testimony that the minutes were poorly prepared.

1    She also notes that Mr. Dement's knowledge of her performance regarding the minutes is based

2    solely on reports from Ms. Delicana.

3                        c.        **Task management**

4           The Secretary presents testimony that she says demonstrates that Ms. Greenlaw was

5    disorganized and had task management issues.  Ms. Nelson testified that Ms. Greenlaw was

6    "ineffective" in keeping a department log or "tracker" of tasks updated, and the information in the

7    tracker "was either not current, not accurate, or there wasn't information in it that should have

8    been in it."  Dkt. No. 120-4, Ex. J (Nelson Dep. at 48:24-49:7, 54:8-12).  According to Ms.

9    Nelson, this was a concern because the department used the log to track the status of work coming

10   into the office, including "responses to congressionals" or "something needed from a directorate in

11   the national office."  *Id*. (Nelson Dep. at 43:13-25).  Ms. Nelson recalls speaking to Mr. Dement

12   "three to four times" about this issue, and that he responded that Ms. Nelson was not the only one

13   who expressed the same concerns.  *Id*. (Nelson Dep. at 56:2-18).

14          The Secretary also presents testimony from Ms. Delicana, Ms. Nelson, and Mr. Dement,

15   who all expressed that Ms. Greenlaw required a significant amount of work to manage.  Ms.

16   Nelson recalled an occasion when Ms. Greenlaw could not properly attach a document to an

17   email, and that Ms. Delicana had to have "more oversight of [Ms. Greenlaw]" to ensure that the

18   department tracker was updated.  *See* Dkt. No. 120-4, Ex. J (Nelson Dep. at 56:15-18, 86:18-87:3,

19   90:25-91:24).  Ms. Delicana testified that there were also concerns about "the priority tasks that

20   we wanted [Ms. Greenlaw] to do," stating that she noticed that Ms. Greenlaw would work for the

21   whistleblower unit, and that the department "struggle[ed] again with her being able to complete

22   the task of support for the Regional Administrator's office," including keeping the department

23   tracker updated.  Consequently, Ms. Delicana says that she "had to check in regularly with her on

24   the status," to "make sure we were aligned in the tasks that she would be working on."  Dkt. No.

25   120-4, Ex. B (Delicana Dep. at 27:15-20); Dkt. No. 127-4 (Delicana Dep. at 43:20-45:14).  Ms.

26   Delicana testified that she also received complaints from Ms. Goto and Mr. Dement about Ms.

27   Greenlaw's performance.  *See* Dkt. No. 127-4 (Delicana Dep. at 215:17-24).

28          Ms. Greenlaw presents evidence of praise she received for her work, including an August

United States District Court
Northern District of California

9

19, 2016 email from Josh Paul, her former supervisor, stating that in connection with a particular project, Ms. Greenlaw worked "independently" and "diligently," went "above and beyond," and was "a big part of the successful roll-out of" the project. *See* Dkt. No. 127-2 at ECF 25, 41. Additionally, another OSHA employee, Patricia Gaydos, noted that Ms. Greenlaw had "scanned documents, done some mailing, and some editing" and did a "good job with a minimum of direction," and "also was instrumental in getting [Ms. Gaydos's] budget revisions in." Dkt. No. 127-2 at ECF 24. Ms. Gaydos further noted that Ms. Greenlaw's performance was "not exemplary, but highly effective to date." *Id*.

### d. Recording meetings

Ms. Delicana testified that she observed that Ms. Greenlaw used her personal cellphone to record the weekly executive meetings. *See* Dkt. No. 120-4, Ex. B (Delicana Dep. at 32:20-22). Ms. Delicana asked Mr. Dement whether a personal cellphone could be used to record OSHA's internal meetings, and Mr. Dement suggested that the department should get a digital recorder for Ms. Greenlaw to use instead. *See id*. (Delicana Dep. at 32:22-33:1). According to Ms. Delicana, "[t]his is a policy that we have consistently told among our staff, not to use personal devices for OSHA-related business." *Id*. (Delicana Dep. at 35:7-9).

Ms. Delicana gave Ms. Greenlaw a department-issued digital recorder to use during internal meetings. *See id*. (Delicana Dep. at 33:2-8). However, Ms. Delicana became "really concerned" when Mr. Dement subsequently told her that he observed that Ms. Greenlaw continued to use her personal cellphone to record OSHA's meetings. *See id*. (Delicana Dep. at 33:8-11, 38:22-39:1). Ms. Delicana testified, "When I spoke to Ms. Greenlaw about this, that this was a concern, she had told me that 'I delete it anyway.' That was not the point. The point was that she could not save federal OSHA meeting discussions on a personal [cellphone]." *Id*. (Delicana Dep. 33:12-16). According to Mr. Dement's testimony, he saw that Ms. Greenlaw was using a personal cellphone to record a meeting, and asked Ms. Delicana to look into it. Mr. Dement says that Ms. Delicana told him that Ms. Greenlaw denied using her phone to record the meeting. *See* Dkt. No. 120-4, Ex. I (Dement Dep. at 212:22-214:20). Mr. Dement testified that this was one of two conduct issues "that stood out in [his] mind that [he] didn't feel like [Ms. Greenlaw] was truthful

1    in making statements." *Id*. (Dement Dep. at 213:3-8).

2        Ms. Greenlaw points out that Ms. Delicana agreed that the use of a recording device by an

3    administrative assistant is not unusual; that the only concern Ms. Delicana identified about using a

4    personal cellphone was that a personal device might have to be produced in response to a FOIA

5    request; Ms. Delicana testified that she had never actually produced a physical recording device in

6    response to a FOIA request; and Ms. Delicana was not aware that Ms. Greenlaw had ever used the

7    recordings she made for an improper purpose. *See* Dkt. No. 127-4 (Delicana Dep. at 33:25-34:2,

8    35:1-36:10, 36:21-37:3, 37:25-38:19).

9                    e.    **August 2, 2016 incident**

10        According to the Secretary, on August 2, 2016 Ms. Greenlaw caused a security incident in

11    the federal building where the OSHA Region 9 office is located.  There is no dispute that an

12    incident involving Ms. Greenlaw and the building's security occurred.  However, the parties

13    diverge somewhat in describing how the incident unfolded.

14        On the day in question, Ms. Greenlaw took a cart of supplies (which were to be donated to

15    an outside organization) to the lobby.  According to Ms. Delicana, Ms. Greenlaw told her that she

16    was approached by building security personnel who said that she could not leave the supplies

17    unattended, but Ms. Greenlaw told Ms. Delicana not to worry about it because she "hid" the cart.

18    Ms. Delicana told Ms. Greenlaw that she did not think that was a good idea and that they needed

19    to go get the cart, and Ms. Greenlaw said she would take care of it.  Ms. Delicana says that a few

20    minutes later, she received a call from OASAM advising that security offers reported that Ms.

21    Greenlaw did not follow their instructions and that it could have resulted in shutting down the

22    building because she left the supplies unattended.  *See* Dkt. No. 120-4, Ex. B (Delicana Dep. at

23    47:15-49:19).

24        The incident was escalated to Mr. Dement.  He does not recall how he learned about it,

25    although Ms. Delicana testified that he approached her about the incident after attending a meeting

26    with General Services Administration ("GSA"), which manages the federal building.  *See* Dkt. No.

27    120-4, Ex. B (Delicana Dep. at 49:22-50:2); *Id*., Ex. I (Dement Dep. at 216:15-18).  Mr. Dement's

28    understanding was that Ms. Greenlaw had a "disagreement" with security personnel, did not

United States District Court
Northern District of California

1    follow their instructions, and left the supplies unattended in the building.  After reviewing

2    statements from Ms. Greenlaw, the security guards involved, and GSA employee Michelle

3    Daniels, Mr. Dement believed that Ms. Greenlaw had omitted material information from her

4    statement.  *See* Dkt. No. 120-4, Ex. I (Dement Dep. at 217:22-222:25).

5          In deposition, Ms. Greenlaw did not recall leaving the cart with supplies unattended for

6    any period of time.  *See* Dkt. No. 127-5 (Greenlaw Dep. at 136:2-18).  However, she argues that

7    the salient facts from the August 2, 2016 incident are that Ms. Daniels, who purportedly saw the

8    cart of supplies unattended in the lobby, (1) did nothing about it at the time, (2) documented the

9    incident only after being asked to provide a statement, and (3) in her email statement, addressed to

10   Ms. Delicana, Ms. Daniels pointed out that she "notice[d] that Ms. Greenlaw was without her

11   service dog and was informed by the guards that during the cart encounter she did not have her

12   service dog with her."  *See* Dkt. No. 127-7 (Daniels Dep. at 24:18-22); *see also* Dkt. No. 127-2 at

13   ECF 32.  Ms. Greenlaw says that Tippi was with her when she was moving the cart around the

14   building (*see* Dkt. No. 127-5 (Greenlaw Dep. at 136:2-18), and argues that Ms. Daniels's

15   comment about Tippi not being with her in the lobby is gratuitous and entirely irrelevant to the

16   August 2, 2016 incident.  Additionally, Ms. Greenlaw points out that in deposition, Mr. Dement

17   initially testified that she omitted information about "being advised by security that she can't leave

18   the boxes . . . on the outside, and that she left the boxes out in the public area, even though she was

19   told not to."  *See* Dkt. No. 127-10 (Dement Dep. at 219:16-220:10).  He later acknowledged that

20   he was incorrect, and clarified that Ms. Greenlaw omitted information that she left the cart of

21   supplies in the lobby area.  *See id*. (Dement Dep. at 227:2-14).  Mr. Dement also noted in

22   deposition that Ms. Daniels's statement reported that Ms. Greenlaw did not have Tippi with her.

23   *See id*. (Dement Dep. at 220:9-25).  Although Mr. Dement testified that the comment about Tippi

24   was not something he weighed against Ms. Greenlaw, Ms. Greenlaw contends that the

25   inconsistency in his testimony regarding omissions from her statement call into question Mr.

26   Dement's credibility.

27          **5.    Termination**

28          On October 28, 2016, Ms. Greenlaw was terminated from the OSHA Administrative

1    Assistant position.  Mr. Dement attests that he made the decision to terminate Ms. Greenlaw due

2    to "poor performance and misconduct."  In deposition, he testified that Ms. Greenlaw was not "the

3    right fit for the position," and that "[n]othing about the dog was considered in deciding to"

4    terminate her employment.  Dkt. No. 120-3 ¶ 11; Dkt. No. 120-4, Ex. I (Dement Dep. at 189:3-4,

5    210:25-212:1); *see also* Dkt. No. 127-4 (Delicana Dep. at 25:22-26:2).

6        In deposition, OASAM employee Lenada Bell testified that she was a relatively new

7    OASAM employee around the Fall of 2016 when Ms. Delicana reached out to her regarding issues

8    about Ms. Greenlaw.  Ms. Bell subsequently communicated with Ms. Delicana and Mr. Dement,

9    and met with them once regarding Ms. Greenlaw.  Ms. Bell could not recall many details about the

10   situation, or what evidence Ms. Delicana or Mr. Dement may have provided.  Ms. Bell mainly

11   recalls that Ms. Delicana and Mr. Dement reported that things were not working out with respect

12   to Ms. Greenlaw's performance, that she was not getting along with other employees, and that

13   they did not think Ms. Greenlaw was a good fit for the office.  While Ms. Bell noted that an

14   employee cannot be terminated without "some sort of justification in writing" or "proof," she

15   stated that as Ms. Greenlaw was an at-will or at-risk employee, not a lot of information was

16   required for the termination of her employment.  *See* Dkt. No. 120-4, Ex. E (Bell Dep. at 30:10-

17   22, 31:24-32:19, 33:3-9, 35:8-24, 38:6-39:5, 40:6-18, 51:25-52:11).  Ms. Bell did not know that

18   Ms. Greenlaw had a dog.  *See id*. (Bell Dep. at 76:22-25).

19       **B.    Procedural History**

20       On November 15, 2016, Ms. Greenlaw appealed her non-selection for the Whistleblower

21   Investigator position to the Merit Systems Protection Board ("MSPB").  *See* Dkt. No. 120-4, Ex.

22   O.[3]  On December 22, 2016, the MSPB denied Ms. Greenlaw's appeal for lack of jurisdiction.  *See*

23   _____

24   [3]  The Court grants the Secretary's request for judicial notice of records from Ms. Greenlaw's
     administrative proceedings, namely (1) her two MSPB appeals, (2) the MSPB's two initial
25   decisions, (3) Ms. Greenlaw's formal and informal Complaints of Discrimination; (4) the EEOC's
     order dismissing Ms. Greenlaw's complaint; and (5) the MSPB's two final orders.  Dkt. No. 121;
26   Dkt. No. 120-4 Exs. O-S, U.  Ms. Greenlaw has not opposed the request for judicial notice or
     questioned the authenticity of the subject documents.  Fed R. Evid. 201; *see also Singh v. U.S.*
27   *Postal Serv.*, No. 17-cv-02211-DMR, 2017 WL 11471761, at *4 n.3 (N.D. Cal. Oct. 10, 2017)
     (taking judicial notice of MSPB decisions); *Blackman-Baham v. Kelly*, No. 16-CV-03487-JCS,
28   2017 WL 679514, at *3 n.5 (N.D. Cal. Feb. 21, 2017) (taking judicial notice of MSPB appeals);
     *Dornell v. City of San Mateo*, 19 F. Supp. 3d 900, 904 n.3 (N.D. Cal. 2013) (taking judicial notice

United States District Court
Northern District of California

13

*id.*, Ex. P.

On November 15, 2016, Ms. Greenlaw also appealed her termination to the MSPB, alleging discrimination and retaliation. *See* Dkt. No. 120-4, Ex. Q. The MSPB dismissed that appeal for lack of jurisdiction. *See id.*, Ex. R.

On December 1, 2016, Ms. Greenlaw filed an informal complaint asserting discrimination and reprisal with DOL's Civil Rights Center, followed by a formal discrimination and reprisal complaint on December 19, 2016. *See id.*, Ex. S. The EEOC dismissed Ms. Greenlaw's claims. *Id.* Ex. U.

Ms. Greenlaw filed the present action on August 14, 2018, and filed an amended complaint (the operative pleading) on September 4, 2018. The amended complaint references Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17 ("Title VII"), the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621 to 634 ("ADEA"), the Rehabilitation Act, 29 U.S.C. §§ 791 *et seq.* ("Rehabilitation Act"), and the Freedom of Information ("FOIA") and Privacy Acts, 5 U.S.C. § 552, *et seq.*, and also makes passing reference to the "Americans with Disabilities Act," Dkt. No. 8 at ECF 6-7. The amended complaint asserted federal claims for "Age Discrimination," "Disability Discrimination," "Retaliation," and under the "FOIA and Privacy Act," as well as state law tort claims alleging that "[t]he conduct by Defendants constitutes an abuse of process, negligent and intentional infliction of emotional distress, conversion, [and] breach of the covenant of good faith and fair dealing." *Id.* ¶ 52.

On May 17, 2019, the Court granted the Secretary's motion to dismiss Ms. Greenlaw's Title VII, ADEA, and Rehabilitation Act claims for failure to exhaust administrative remedies. Dkt. No. 37.[4] Ms. Greenlaw appealed that decision to the Ninth Circuit. Dkt. No. 72. While that

---

of public records from EEOC proceedings "whose accuracy is not in dispute"). The Court also takes judicial notice of Ms. Greenlaw's own description of the discrimination alleged in the subject documents. *See Pringle v. Wheeler*, 478 F. Supp. 3d 899, 905 n.1 (N.D. Cal. 2020). However, the Court does not accept as true any disputed facts contained in these records. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018).

[4] The Court also granted the Secretary's motion to dismiss Ms. Greenlaw's state law claims for relief and to strike her request for punitive damages. Dkt. No. 37 at 10. The Court subsequently granted summary judgment for the Secretary on Ms. Greenlaw's FOIA and Privacy Act claims. Dkt. No. 70. Ms. Greenlaw has not challenged those particular rulings. *See* Dkt. No. 50 at 1 n.2;

United States District Court
Northern District of California

1    appeal was pending, the MSPB issued its final decisions regarding her claims.  Accordingly, the

2    Ninth Circuit vacated this Court's judgment on the Title VII, ADEA, and Rehabilitation Act

3    claims and remanded the matter to this Court for further proceedings.  Dkt. No. 75.

4         Following remand, the Court ordered supplemental briefing from the parties on the

5    question of what further administrative proceedings, if any, were required with respect to Ms.

6    Greenlaw's remaining claims under Title VII, the ADEA, and the Rehabilitation Act.  Dkt. No. 83.

7    Upon consideration of the parties' supplemental briefing, the Court concluded that administrative

8    exhaustion did not implicate the Court's subject matter jurisdiction "with respect to Ms.

9    Greenlaw's Title VII claim, or . . . her Rehabilitation Act claim, as to which Title VII remedies,

10   rights, and procedures apply[.]"  Dkt. No. 90 at 2 (citing 29 U.S.C. § 794a(a)(1)).  The Court also

11   found that the Secretary did not identify a basis to preclude Ms. Greenlaw from proceeding with

12   her ADEA claim.  *Id.*  Accordingly, Ms. Greenlaw was permitted to proceed with her remaining

13   claims in this litigation.  *Id.* at 3.

14                                        * * *

15        The Secretary now moves for summary judgment, renewing her argument that Ms.

16   Greenlaw did not administratively exhaust her claims and that this Court lacks subject matter

17   jurisdiction over any remaining claims for relief.  Even assuming Ms. Greenlaw administratively

18   exhausted her claims, the Secretary contends that Ms. Greenlaw does not have sufficient evidence

19   to proceed to a jury trial and that her claims fail as a matter of law.

20   **II.    LEGAL STANDARD**

21        A motion for summary judgment should be granted if there is no genuine issue of material

22   fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a);

23   *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986).  The moving party bears the initial

24   burden of informing the court of the basis for the motion, and identifying portions of the

25   pleadings, depositions, answers to interrogatories, admissions, or affidavits which demonstrate the

26   absence of a triable issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  In

27   _____

28   Dkt. No. 75 at 2.

United States District Court
Northern District of California

1    order to meet its burden, "the moving party must either produce evidence negating an essential

2    element of the nonmoving party's claim or defense or show that the nonmoving party does not

3    have enough evidence of an essential element to carry its ultimate burden of persuasion at trial."

4    *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies, Inc*., 210 F.3d 1099, 1102 (9th Cir. 2000).

5         If the moving party meets its initial burden, the burden shifts to the non-moving party to

6    produce evidence supporting its claims or defenses.  *See id*. at 1102.  The non-moving party may

7    not rest upon mere allegations or denials of the adverse party's evidence, but instead must produce

8    admissible evidence that shows there is a genuine issue of material fact for trial.  *See id*.  A

9    genuine issue of fact is one that could reasonably be resolved in favor of either party.  A dispute is

10   "material" only if it could affect the outcome of the suit under the governing law.  *Anderson*, 477

11   U.S. at 248-49.

## III.    DISCUSSION

### A.    Withdrawal of ADEA Claim

14        In response to the Secretary's summary judgment motion, Ms. Greenlaw did not offer any

15   argument or evidence with respect to the ADEA.  Instead, Ms. Greenlaw stated that she

16   "withdraws her claims based on age discrimination" and requests that the Court deny as moot the

17   Secretary's summary judgment motion on those issues.  Dkt. No. 127 at 1.  The Secretary does not

18   oppose the withdrawal of the ADEA claim in principle.  However, the Secretary argues that the

19   Court should grant her motion for summary judgment on the ADEA claim, arguing that Ms.

20   Greenlaw has conceded the motion on the merits.  *See* Dkt. No. 128 at 1 n.1.

21        "Federal Rule of Civil Procedure 15(a) is the appropriate mechanism where a plaintiff

22   desires to eliminate an issue, or one or more but less than all of several claims, but without

23   dismissing as to any of the defendants."  *Hells Canyon Pres. Council v. U.S. Forest Serv*., 403

24   F.3d 683, 688 (9th Cir. 2005) (cleaned up); *see also Ethridge v. Harbor House Rest*., 861 F.2d

25   1389, 1392 (9th Cir. 1988).  That rule provides that "[t]he court should freely give leave [to amend

26   a complaint] when justice so requires."  Fed. R. Civ. P. 15(a)(2).  In determining whether

27   amendment should be permitted, courts consider whether the amendment would cause the

28   opposing party undue prejudice, is sought in bad faith, constitutes an exercise in futility, or creates

United States District Court
Northern District of California

1    undue delay.  *Foman  v. Davis*, 371 U.S. 178, 182 (1962).  Prejudice to the opposing party is the

2    "touchstone of the inquiry under [R]ule 15(a)" and "carries the greatest weight" among the factors

3    identified in *Foman*.  *Eminence Cap., LLC v. Aspeon, Inc*., 316 F.3d 1048, 1052 (9th Cir. 2003)

4    (per curiam).  The decision whether to grant leave to amend is committed to the sound discretion

5    of the trial court.  *Waits v. Weller*, 653 F.2d 1288, 1290 (9th Cir. 1981).

6            "The district court may, in its discretion, impose 'reasonable conditions' on a grant of

7    leave to amend a complaint."  *Int'l Ass'n of Machinists & Aerospace Workers v. Republic*

8    *Airlines*, 761 F.2d 1386, 1391 (9th Cir. 1985) (citation omitted).  "In determining whether to

9    impose conditions, the factors that are relevant to determining whether to grant leave initially may

10   be considered."  *Id*.; *see also Upek, Inc. v. Authentec, Inc*., No. 10-424-JF PVT, 2010 WL

11   2681734, at *4 (N.D. Cal. July 6, 2010) ("In the exercise of sound discretion, the granting of leave

12   to amend can be conditioned in order to avoid prejudice to the opposing party.") (cleaned up).

13   Such conditions may include "that claims contained in the original complaint but not included in

14   the amended complaint be considered dismissed with prejudice."  *Vanguard Logistics Servs.*

15   *(USA), Inc. v. Groupage Servs. of New England, LLC*, No. CV 18-517 DSF (GJSx), 2021 WL

16   4520969, at *1 (C.D. Cal. Jan. 4, 2021) (quoting *Matlink, Inc. v. Home Depot U.S.A., Inc*., No. 07-

17   cv-1994 DMS (BLM), 2008 WL 11338407, at *1 (S.D. Cal. July 10, 2008)).

18           The Court construes Ms. Greenlaw's statement of withdrawal as a motion for leave to

19   amend her complaint to drop her ADEA claim.  *See* Dkt. No. 127 at ECF 5 (citing *Hells Canyon*).

20   Although the Secretary does not oppose withdrawal of that claim, the Secretary argues

21   persuasively that in these circumstances, it would not be fair or proper to dispose of Ms.

22   Greenlaw's ADEA claim in a way that leaves open the possibility that she could reassert it again

23   later.  The parties have litigated this matter for years and conducted considerable discovery.  It was

24   only after the Secretary presented her evidence and arguments in her opening summary judgment

25   brief that Ms. Greenlaw withdrew her claim.  Ms. Greenlaw has not substantively responded to the

26   Secretary's summary judgment motion on the ADEA claim or presented any argument or evidence

27   that would preclude summary adjudication on that claim.  Under these circumstances, a dismissal

28   of Ms. Greenlaw's age discrimination claims without prejudice would be prejudicial to the

United States District Court
Northern District of California

17

1    Secretary.  *See AF Holdings, LLC v. Navasca*, No. 12-cv-02396-EMC, 2013 WL 1748011, at *4

2    (N.D. Cal. Apr. 23, 2013) (finding legal prejudice where dismissal without prejudice would

3    deprive defendant "at the very least, of the benefit of rulings favorable to him.").

4            Accordingly, the Court grants Ms. Greenlaw's motion for leave to amend her complaint to

5    withdraw her claim for age discrimination under the ADEA, on the condition that the claim shall

6    be considered dismissed with prejudice.

7        **B.    Remaining Claims**

8            There is no indication that Ms. Greenlaw's remaining claims arise under Title VII, which

9    prohibits discrimination on the basis of an individual's "race, color, religion, sex, or national

10   origin."  42 U.S.C. § 2000e-2(a).  Nothing in the record suggests that her allegations are based on

11   any of those protected classifications.  Indeed, at the motion hearing, the parties agreed that Ms.

12   Greenlaw's remaining claims are for disability discrimination under the Rehabilitation Act, and

13   that the alleged discrimination is based on (1) the failure to hire her for the Whistleblower

14   Investigator position; (2) the failure to promote her to the Staff Assistant position; and (3) the

15   termination of her employment as Administrative Assistant.  *See* Dkt. No. 133.  Additionally, at

16   the motion hearing, Ms. Greenlaw confirmed that the only retaliation claim that she asserts is

17   retaliation for filing an EEOC complaint.  The alleged retaliation arises out of a performance

18   review Ms. Delicana gave to the Census Bureau around March 2020, several years after Ms.

19   Greenlaw was terminated from her employment with OSHA.  *See* Dkt. No. 127 at ECF 7; *see also*

20   Dkt. No. 133.

21           **1.    Retaliation Claim**

22           The parties disagree about whether Ms. Greenlaw's retaliation claim arises under Title VII

23   or the Rehabilitation Act, and whether the claim is properly part of this lawsuit.  The Secretary

24   contends that, as Ms. Greenlaw's allegations do not implicate any protected classifications under

25   Title VII, her retaliation claim can only arise under the Rehabilitation Act.  *See* Dkt. No. 120 at

26   ECF 29 (quoting *McCarthy v. Brennan*, No. 15-cv-03308-JSC, 2016 WL 946099, at *12 (N.D.

27   Cal. Mar. 14, 2016) ("[A] plaintiff may bring a retaliation claim only under the statute under

28   which he alleged the protected activity—that is, a Title VII retaliation claim can only allege

United States District Court
Northern District of California

reprisal for engaging in prior protected activity reporting race, religion, gender, and national origin discrimination; an ADEA retaliation claim can only allege reprisal for engaging in prior protected activity reporting age discrimination; and so on.").  As noted above, the Secretary maintains that Ms. Greenlaw has not administratively exhausted any of her claims for relief.  *See* Dkt. No. 120 at ECF 21-22; Dkt. No. 128 at ECF 7-8.  Although Ms. Greenlaw's briefing indicates that her retaliation claim arises under the Rehabilitation Act (*see, e.g.,* Dkt. No. 127 at ECF 16), at the motion hearing she argued that her retaliation claim may arise under either the Rehabilitation Act or Title VII, as both statutes contain anti-retaliation provisions.  *See* Dkt. No. 133.  She argues that the issue of exhaustion is "irrelevant" and maintains that she administratively exhausted her remedies by filing an EEOC complaint.  *See* Dkt. No. 127 at ECF 16-17.

Ms. Greenlaw's allegations do not implicate any protected classifications under Title VII, and she has not demonstrated that her retaliation claim arises under that statute.  Her amended complaint does not allege retaliation for filing an EEOC complaint.  *See generally* Dkt. No. 8.  Nor has she sought to amend her complaint to assert such a claim.  Accordingly, the Secretary's summary judgment motion on Ms. Greenlaw's retaliation claim is granted.

### 2. Rehabilitation Act:  Disability Discrimination

The Secretary maintains that Ms. Greenlaw has never administratively exhausted any of her claims, including under the Rehabilitation Act, and that the Court therefore lacks subject matter jurisdiction over any claims for relief.  *See* Dkt. No. 120 at ECF 21-22; Dkt. No. 128 at ECF 7-8.  As noted above, Ms. Greenlaw argues that the issue of exhaustion is "irrelevant" and maintains that she administratively exhausted her remedies by filing an EEOC complaint.  *See* Dkt. No. 127 at ECF 16-17.  When the Court asked the Secretary at the motion hearing about the bases for her position regarding exhaustion, the Secretary stated that she had nothing to add to her briefing, but asserted the Court need not reach the exhaustion issue.  The Secretary stated that she prefers that the Court proceed with the merits of Ms. Greenlaw's Rehabilitation Act claim.  *See* Dkt. No. 133.

As discussed above, the Court has already concluded that the administrative exhaustion requirement does not implicate its subject matter jurisdiction with respect to Ms. Greenlaw's

1    Rehabilitation Act claim.  *See* Dkt. No. 90.  As nothing in the Secretary's present motion compels

2    a different conclusion, and in view of the Secretary's stated preference for the Court to address the

3    merits of Ms. Greenlaw's Rehabilitation Act claim, the Court now does so.

### a.    Burden-Shifting Framework

5        The Rehabilitation Act provides the exclusive remedy for disability discrimination in

6    federal employment.  *See Boyd v. U.S. Postal Serv.*, 752 F.2d 410, 413 (9th Cir. 1985).  As

7    discussed above, Ms. Greenlaw does not claim a failure to accommodate, but rather disparate

8    treatment based on her disability.  To establish a prima facie case of disparate treatment under the

9    Rehabilitation Act, "a plaintiff must demonstrate that (1) she is a person with a disability, (2) who

10   is otherwise qualified for employment, and (3) suffered discrimination because of her disability."

11   *Walton v. U.S. Marshals Serv.*, 492 F.3d 998, 1005 (9th Cir. 2007), *superseded by statute on other*

12   *grounds*.  Because such claims are decided using the same standards as claims under Title I of the

13   ADA, *see* 29 U.S.C. § 791(f), Ms. Greenlaw must show that that her disability was a but-for cause

14   of the adverse employment action, i.e., "that the adverse employment action would not have

15   occurred but for the disability."  *Murray v. Mayo Clinic,* 934 F.3d 1101, 1105 (9th Cir. 2019); *see*

16   *also Gunzenhauser v. Garland*, No. 22-cv-03406-WHO, 2023 WL 2167387, at *4 (N.D. Cal. Feb.

17   21, 2023) (same).

18       Disability discrimination claims are subject to the burden-shifting analysis set forth in

19   *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Mattioda v. Nelson*, 98 F.4th 1164,

20   1178 (9th Cir. 2024) (applying *McDonnell Douglas* framework to Rehabilitation Act claims).

21   Under the *McDonnell Douglas* framework, if a plaintiff establishes a prima facie case of disability

22   discrimination, "the burden shifts to the employer to provide a non-discriminatory reason for the

23   adverse action."  *Id*.  The employer's burden is one of production, not persuasion.  *Id*. at 1179

24   (citing *Opara v. Yellen*, 57 F.4th 709, 725-27 (9th Cir. 2023)).  "If the employer meets that

25   burden, then the employee must show that the employer's reason is pretextual."  *Id*. at 1178.  A

26   plaintiff can establish pretext "either (1) directly, by showing that unlawful discrimination more

27   likely than not motivated the employer, (2) indirectly, by showing that the employer's proffered

28   explanation is unworthy of credence because it is internally inconsistent or otherwise not

United States District Court
Northern District of California

believable," or through "a combination of these two kinds of evidence." *Opara*, 57 F.4th at 723 (cleaned up; quotations and citations omitted). Generally, "very little evidence is necessary to raise a genuine issue of fact regarding an employer's motive." *Id*. at 723-24 (cleaned up; quotations and citation omitted). "For instance, the Supreme Court has instructed that 'a plaintiff's prima facie case, combined with . . . evidence . . . that the employer's asserted justification is *false*, may' be enough." *Id*. at 724 (quoting *Reeves v. Sanderson Plumbing Prods., Inc*., 530 U.S. 133, 148 (2000)). "However, the plaintiff at all times retains the ultimate burden of persuading the trier of fact that an employer's contested action was due in part or in whole to discriminatory intent." *Id*. (cleaned up; quotations and citations omitted). "Accordingly, where 'abundant and uncontroverted independent evidence' suggests that 'no discrimination . . . occurred,' plaintiff's 'creat[ion of] only a weak issue of fact as to whether the employer's reason was untrue' will not suffice." *Id*. (quoting *Reeves*, 530 U.S. at 148).

For purposes of resolving the present summary judgment motion, the first element of the prima facie case is not at issue. While the Secretary disputes that Ms. Greenlaw is a person with a disability, she explicitly states that she is not raising that issue in the present motion. *See* Dkt. No. 120 at ECF 25 n.4. In addition, there can be no question that unfavorable hiring or promotion decisions and termination of employment constitute adverse employment actions. However, the Secretary argues that she is entitled to judgment as a matter of law because Ms. Greenlaw cannot establish the other elements of a prima facie case, i.e., that she is otherwise qualified for employment, and that her disability was the but-for cause of any adverse employment action. Even assuming Ms. Greenlaw could establish a prima facie case of disability discrimination, the Secretary contends that DOL had legitimate, nondiscriminatory reasons for each of the challenged employment actions and that Ms. Greenlaw cannot show that DOL's proffered reasons were mere pretext for discrimination.

### b.      Failure to Hire for Whistleblower Investigator Position

Ms. Greenlaw contends that she was qualified for the Whistleblower Investigator position because in her prior federal employment she held a position at a pay grade commensurate with that of the Whistleblower Investigator position. *See* Dkt. No. 120-4, Ex. A (Greenlaw Dep. at 126:23-

127:1)..  She also notes that she received praise for certain work she performed in connection with a whistleblower program while employed as an Administrative Assistant.  *See* Dkt. No. 127-2 at ECF 25, 41; Dkt. No. 127-5 (Greenlaw Dep. at 122:25-123:3).  She does not articulate or explain how or why her prior federal experience qualified her for the Whistleblower Investigator position, or how or why her performance of certain tasks qualified her to perform the Whistleblower Investigator position as a whole.  She also testified that she was referred for consideration for the Whistleblower Investigator position as a "highly qualified" candidate.  *See id*. (Greenlaw Dep. at 133:15-20).  The basis for that assertion is not clear.

With respect to the issue of causation, the Secretary contends that Ms. Greenlaw cannot show that her disability was the but-for reason she was not selected for the Whistleblower Investigator position.  The Secretary points out that Mark Marchione, who was at that time a Regional Supervisory Investigator in the Region 9 Whistleblower Protection Program, is the person who made the hiring decision.  Mr. Marchione avers that he never knew that Ms. Greenlaw was disabled or had cancer.  *See* Dkt. No. 119-1 ¶¶ 4, 5, 11, 14-15.  Additionally, the Secretary notes that in deposition, Ms. Greenlaw testified that, aside from the fact that Tippi was with her, she did not disclose anything about her disability during the interview process.  *See* Dkt. No. 120-4, Ex. A (Greenlaw Dep. at 129:9-22); Dkt. No. 127-5 (Greenlaw Dep. at 217:10-19).  Ms. Greenlaw has presented no evidence raising a triable issue as to those facts.

Ms. Greenlaw posits that a jury reasonably could infer that Ms. Delicana, whom she alleges disliked Tippi, tainted the selection process for the Whistleblower Investigator position and ruined her chance of being selected.  *See Staub v. Proctor Hosp.*, 562 U.S. 411, 413 (2011) (describing cat's paw theory as "circumstances under which an employer may be held liable for employment discrimination based on the discriminatory animus of an employee who influenced, but did not make, the ultimate employment decision."); *Mattioda*, 98 F.4th at 1178 ("Even if a biased employee was not the final decisionmaker, a plaintiff may rely on a 'cat's paw' theory to establish a causal link by proving that the biased non-decision-making employee 'influenced or was involved in the decision or decisionmaking process.'" (quoting *France v. Johnson*, 795 F.3d 1170, 1176 (9th Cir. 2015)).  Ms. Greenlaw argues that a jury could draw such an inference based

22

1   on the following undisputed facts:  (1) Ms. Delicana served on the 3-person selection panel, along

2   with Mr. Marchione and James Wulff (Assistant Regional Administrator for Enforcement

3   Programs), (2) each applicant's score was determined collectively by the panel members,[5] (3) Ms.

4   Delicana testified that Mr. Marchione considered the feedback of the panel in making his hiring

5   decision and that his hiring decision was consistent with the panel's feedback; and (4) Tippi was

6   present with Ms. Greenlaw during the interview.  *See* Dkt. No. 120-4, Ex. A (Greenlaw Dep. at

7   129:9-22); Dkt. No. 120-4, Ex. B (Delicana Dep. at 205:2-25); Dkt. No. 127-4 (Delicana Dep. at

8   224:1-6); Dkt. No. 127-5 (Greenlaw Dep. at 217:10-25).  Missing from this analysis, however, is

9   any evidence that the panel deferred to Ms. Delicana or, more fundamentally, that any panel

10  member discussed or considered Tippi or Ms. Greenlaw's disability during the selection process.

11  Ms. Greenlaw's reliance on a cat's paw theory appears to be based on nothing more than her own

12  speculation that Ms. Delicana must have influenced the panel against her based on her disability.

13  *See Mattioda*, 98 F.4th at 1178 (finding cat's paw theory "dubious" absent evidence that panel

14  deferred to alleged bias employee and "where the only supporting evidence is [plaintiff's] own

15  speculative declaration and evidence that [alleged biased employee] was initially appointed to the

16  selection panel and shared the candidates' h-indices before recusing himself."). *Cf. France v.*

17  *Johnson*, 795 F.3d 1170, 1176 (9th Cir. 2015) (reversing summary judgment where biased

18  employee created the positions at issue, would be supervising the successful applicants, and panel

19  members deferred to his recommendations).  Accordingly, Ms. Greenlaw has not presented

20  evidence sufficient to create a triable issue regarding a prima facie case of disability discrimination

21  in her non-selection for the whistleblower position.

22          Even assuming that she presented evidence establishing a prima facie case of disability

23  discrimination, the Secretary offers a legitimate nondiscriminatory reason for Ms. Greenlaw's

24  non-selection for the Whistleblower Investigator position, and Ms. Greenlaw has not presented

25  evidence demonstrating that the Secretary's reason is pretextual.  Mr. Marchione attests that all

---

[5] Although it is not entirely clear from the record presented, at the motion hearing, defense counsel confirmed his understanding that applicants' scores reflected on charts appended to Ms. McCormick's declaration (*see* Dkt. No. 119-2 ¶ 11, Ex. L) were collectively agreed upon by the panel members.

United States District Court
Northern District of California

1    applicants were evaluated "based on their likelihood to succeed in the position for which they

2    were applying based on their responses to the same questions, submission of a writing sample, and

3    scores that the interview panel and hiring committee determined on a scale of one to ten." Dkt.

4    No. 119-1 ¶ 9. Mr. Marchione further states that "applicants other than Rosemary Greenlaw had a

5    greater likelihood of succeeding as a Whistleblower Investigator." *Id.* ¶ 10. The Secretary

6    submits charts indicating that applicants were scored based on their interview, as well as a number

7    of other criteria, including a writing sample. *See* Dkt. No. 119-2 ¶ 11, Ex. L. Those charts

8    indicate that while Ms. Greenlaw scored higher than some other applicants on her writing sample

9    and in a category titled "State Plan," she received the lowest scores in categories titled

10   "Multitask," "Manageability," "Critical Thinking," and "Oral Com," as well as the overall lowest

11   score of all applicants interviewed by the panel. *See id.* Mr. Marchione also presents evidence of

12   a contemporaneous email memo he sent to Mr. Wulff and Ms. Delicana, explaining his hiring

13   decision, including highlighting the successful applicants' prior investigatory or whistleblower

14   program experience. *See* Dkt. No. 119-1 ¶ 12, Ex. T. Ms. Greenlaw does not appear to contend

15   that she had comparable experience, or articulate or explain how or why such an inference

16   reasonably could be drawn from the record presented. In deposition, Ms. Greenlaw testified that

17   she did not know if any other applicants have disabilities or what criteria was used to evaluate

18   applicants, and she acknowledged that there may have been "other highly qualified candidates."

19   *See* Dkt. No. 120-4, Ex. A (Greenlaw Dep. at 132:21-24, 132:15-20).

20        Accordingly, the Court grants the Secretary's motion for summary judgment with respect

21   to Ms. Greenlaw's Rehabilitation Act claim based on her non-selection for the Whistleblower

22   Investigator position.

23                          **c.    Failure to Promote to Staff Assistant Position**

24        Ms. Greenlaw contends that she was qualified for the Staff Assistant position because she

25   held a position at a higher pay grade in her prior federal service; in her then-current position, she

26   performed tasks that fell within the Staff Assistant position; and she received praise for certain

27   work she says is relevant to that position. *See* Dkt. No. 127 at ECF 19; Dkt. No. 127-2 at ECF 25,

28   41. The record is unclear whether Ms. Greenlaw actually performed tasks that fell within the Staff

United States District Court
Northern District of California

Assistant position.  Ms. Greenlaw says that she believed that she performed such work.  *See* Dkt. No. 127 at ECF 11.  The Secretary points out that Ms. Greenlaw testified that no one at DOL told her that she was performing work beyond her pay grade as an Administrative Assistant.  *See* Dkt. No. 120-4, Ex. A (Greenlaw Dep. at 155:3-6).  Even assuming that Ms. Greenlaw did perform tasks that fell within the Staff Assistant position and received praise for that work, she fails to present any evidence (or to even articulate or explain) what the Staff Assistant position entailed, how or why her prior federal experience qualified her for that position, or how or why her performance of certain tasks qualified her to perform the Staff Assistant position as a whole.

With respect to causation, Ms. Greenlaw presents no evidence creating a triable fact issue that her requested promotion would not have been denied but for her disability.  The record reflects that after Ms. Greenlaw requested a promotion to the Staff Assistant position, she met with Ms. Delicana, Mr. Wulff, and Barbara Goto to discuss her request.  In deposition, Ms. Delicana recalled that during the meeting, Ms. Goto indicated that there was a hiring freeze and Ms. Greenlaw's requested promotion could be considered in the future, but not at that time.  *See* Dkt. No. 127-4 (Delicana Dep. at 219:25-222:17).  The Secretary also presents evidence that the Staff Assistant position was never filled by anyone.  *See* Dkt. No. 119-2 ¶ 15.  Ms. Greenlaw argues that the fact that the position was never filled "does not necessarily imply absence of discrimination in failing to promote [her]" to the position.  Dkt. No. 127 at ECF 19.  However, Ms. Greenlaw presents no evidence, in the first instance, indicating that her disability was the but-for cause of the denial of her requested promotion.

Although the degree of proof necessary under the *McDonnell Douglas* framework to establish a prima facie case on summary judgment has been described as "minimal," *see Chuang v. Univ. of Cal. Davis, Bd. of Trs.*, 225 F.3d 1115, 1124 (9th Cir. 2000), Ms. Greenlaw has not presented sufficient evidence establishing a prima facie case of disability discrimination with respect to the Staff Assistant position.  Accordingly, the Court grants the Secretary's summary judgment motion on Ms. Greenlaw's Rehabilitation Act claim with respect to the Staff Assistant position.

d.     **Termination of Employment as Administrative Assistant**

There is evidence in the record from which a jury reasonably could find that Ms. Greenlaw was qualified for the Administrative Assistant position for which she was hired.  Ms. Delicana testified that Ms. Greenlaw did well in her interview, and Ms. Delicana was one of the supervisors who recommended Ms. Greenlaw for the Administrative Assistant position.  *See* Dkt. No. 120-4, Ex. B (Delicana Dep. at 206:6-8); Dkt. No. 127-4 (Delicana Dep. at 20:2-14).  Additionally, Ms. Greenlaw points out that during her employment with OSHA, she did receive praise for some of her work.  *See* Dkt. No. 127-2 at ECF 24; *see also id*. at ECF 25, 41.  Although the Secretary references certain matters in Ms. Greenlaw's background, the Secretary presents no evidence or argument that those matters would have disqualified Ms. Greenlaw from being hired for the Administrative Assistant position.  While the Secretary maintains that Ms. Greenlaw was not qualified for the position in view of her performance issues, the Secretary appears to conflate the minimal inference needed to establish a prima facie case with Ms. Greenlaw's burden at the third stage of the *McDonnell Douglas* inquiry to show that the proffered reasons for her termination were pretextual.  *See Aragon v. Republic Silver State Disposal Inc*., 292 F.3d 654, 659 (9th Cir. 2002).

There is no direct evidence in the record of any discriminatory animus.  However, there is circumstantial evidence in the record from which a jury reasonably could conclude that Ms. Greenlaw would not have been terminated from the Administrative Assistant position but for her disability.  *See* Dkt. No. 127-2 at ECF 11.  As discussed above, there is evidence that Ms. Delicana was aware that Ms. Greenlaw was permitted to bring Tippi to work as a reasonable accommodation.  *See, e.g.,* Dkt. No. 127-2 at ECF 13-23.  While Ms. Delicana testified that she personally did not have any problems with Tippi (*see* Dkt. 120-4, Ex. B (Delicana Dep. at 83:6-8), Ms. Greenlaw argues that a jury reasonably could reach the opposite conclusion based on Ms. Delicana's notes chronicling Tippi's behavior and her inquiries to Dr. Callwood about Tippi.  *See* Dkt. No. 127-2 at 13-23.  Ms. Greenlaw also points out that the only performance review she received from Ms. Delicana focused entirely on matters pertaining to her dog or her need for accommodation, and did not address any of the performance or conduct issues on which the

1    Secretary now relies.  *See* Dkt. No. 127 at ECF 11; Dkt. No. 127-2 at ECF 14.  Thus, there is at

2    least some evidence from which a jury could infer that Ms. Delicana was biased against Ms.

3    Greenlaw based on her disability, and that Ms. Delicana provided information that led to Ms.

4    Delicana's termination.  Thus, Ms. Greenlaw has carried her burden to establish a prima facie case

5    that she would not have been terminated but for her disability.

6          The Secretary points out that Mr. Dement, not Ms. Delicana, made the decision to

7    terminate Ms. Greenlaw's employment, that he did so for (1) poor performance and (2) conduct

8    issues, and that "[n]othing about the dog was considered" in his decision to fire Ms. Greenlaw.

9    *See* Dkt. No. 120-3 ¶ 11; Dkt. No. 120-4, Ex. I (Dement Dep. at 189:3-4).  The Secretary has

10   satisfied her burden to present a legitimate, nondiscriminatory reason for Ms. Greenlaw's

11   termination.

12         Ms. Greenlaw's arguments suggest that she is proceeding on a "cat's paw" theory with

13   respect to her termination, i.e., that Ms. Delicana disliked Ms. Greenlaw's having Tippi at work,

14   and that Ms. Delicana influenced Mr. Dement's termination decision.  *See generally* Dkt. No. 127

15   at ECF 11-14, 20-23.  While the Secretary presents Mr. Dement's declaration in which he attests

16   that "[t]hroughout the time that [he] worked with [Ms. Greenlaw], [he] never knew that she had

17   cancer" or "was disabled" (Dkt. No. 120-3 ¶¶ 8-9), Ms. Greenlaw presents evidence indicating

18   that Mr. Dement was aware that Tippi was in the office as a reasonable accommodation for Ms.

19   Greenlaw (*see* Dkt. No. 127-2 at ECF 37-40), and that both he and Ms. Delicana discussed Tippi

20   with DOL personnel responsible for reasonable accommodation issues (*see id.* at ECF 38-40).

21   While there is evidence that Mr. Dement's termination decision was based in part on matters that

22   he personally observed or witnessed, there is also evidence that he relied on Ms. Delicana's

23   reports of Ms. Greenlaw's performance and conduct, including Ms. Delicana's report that Ms.

24   Greenlaw prepared meeting minutes poorly, and that after Mr. Dement says he observed Ms.

25   Greenlaw using her personal cellphone to record internal meetings, Ms. Greenlaw denied doing so

26   when asked about it.  *See* Dkt. No. 120-4, Ex. I (Dement Dep. at 129:12-15; 214:17-20).

27   Additionally, Ms. Greenlaw notes that the Secretary principally relies on testimony from Ms.

28   Delicana and Mr. Dement, while there is a lack of contemporaneous documentation in the record

United States District Court
Northern District of California

27

corroborating the alleged performance and conduct issues for which she was terminated. *See* Dkt. No. 127-2 at ECF 14. A jury considering this record could certainly find that Ms. Greenlaw was terminated for reasons wholly unrelated to Tippi or her disability. But while Ms. Greenlaw's evidence of pretext is very thin, viewing the record as a whole and in the light most favorable to Ms. Greenlaw, the Court concludes that a jury reasonably could find that Mr. Dement's termination decision was not entirely independent of Ms. Delicana's alleged discriminatory animus, and thus, a jury reasonably could find that the Secretary's legitimate, nondiscriminatory reasons for terminating Ms. Greenlaw's employment should not be credited. *Opara*, 57 F.4th at 723; *see also Greisen v. Hanken*, 925 F.3d 1097, 1117 (9th Cir. 2019) (concluding that reasonable jury could find that biased employee's actions were a causal factor in termination decision by another employee, where evidence indicated that termination decision was based to some degree on conduct of biased employee). *Cf. Lakeside-Scott v. Multnomah Cnty.*, 556 F.3d 797, 807 (9th Cir. 2009) (reversing judgment for plaintiff where evidence showed that initial report of misconduct came from presumably biased supervisor, but supervisor's "subsequent involvement in the disciplinary process was so minimal as to negate any inference that the investigation and final termination decision were made other than independently and without bias.").

Accordingly, the Secretary's motion for summary judgment with respect to Ms. Greenlaw's Rehabilitation Act claim based on her termination from the Administrative Assistant position is denied.

## IV.   CONCLUSION

Based on the foregoing, the Court grants the Secretary's motion for summary judgment in part and denies it in part as follows:

1. Ms. Greenlaw is given leave to amend her complaint to withdraw her claim for age discrimination under the ADEA, on the condition that the claim shall be considered dismissed with prejudice.

2. The Secretary's motion for summary judgment is granted with respect to Ms. Greenlaw's Rehabilitation Act claim based on her non-selection for the Whistleblower Investigator position and the denial of her requested promotion to the Staff Assistant position.

28

3. The Secretary's motion for summary judgment is denied with respect to Ms. Greenlaw's Rehabilitation Act claim based on her termination from the Administrative Assistant position.

**IT IS SO ORDERED.**

Dated: January 27, 2025

Virginia K. DeMarchi
United States Magistrate Judge